DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

SAILAJA M. PAIDIPATY (NYBN 5160007)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    sailaja.paidipaty@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) NO. 19-0381-12 CRB |
| Plaintiff, | ) |
| | ) UNITED STATES' SENTENCING |
| v. | ) MEMORANDUM AND OPPOSITION TO |
| | ) SUMMARY SENTENCING |
| ERIC MONTOYA MARQUEZ, | ) |
| Defendant. | ) |

## I. INTRODUCTION

After completing a sale, Eric Montoya Marquez, like any good businessman gave his customer his phone number and said his daily hours were from 3 p.m. to 9 p.m. (Compl.¶¶ 184-185.) Unlike other businessmen, however, Montoya Marquez wasn't selling legal goods - he was selling heroin; and every day, he sold that heroin and other drugs on the streets of the Tenderloin in San Francisco. Montoya Marquez worked as a street-level dealer for the drug trafficking organization (DTO) run by Andy Reanos-Moreno. Reanos-Moreno helped find Montoya Marquez housing in the East Bay. Montoya Marquez then bought drugs from Reanos-Moreno that he resold. The underlying federal

investigation intercepted over 30 communications between Montoya Marquez and Reanos-Moreno relating to drug dealing.  (*See* Declaration of Sailaja M. Paidipaty ("Paidipaty Decl."), Exhibit 1, Line Sheets.)  Montoya Marquez ordered drugs over the phone, which Reanos-Moreno or a courier then delivered for ultimate resale is San Francisco.

Unlike many of his co-defendants, Montoya Marquez is a permanent legal resident in the United States and is out of custody.  Following arrest, he was detained for ten days until the parties agreed to release based on conditions.  Because he will not be subject to immediate deportation, and pursuant to his plea will be subject to a term of supervised release, this Court should order a full Presentence Investigation Report to allow the U.S. Probation Department ("Probation") the opportunity to determine the appropriate conditions of supervision applicable to this case.

Should this Court disagree and opt to sentence Montoya Marquez at the same time as the change of plea hearing, the government respectfully requests that the Court impose a sentence of six months' incarceration, or, at a minimum, home confinement (the low-end of the applicable Guidelines range), followed by one year of supervised release, and a mandatory $100 special assessment.

## II.     SENTENCING GUIDELINES CALCULATION

As set forth in the parties' written plea agreement, the parties agree to the following U.S. Sentencing Guidelines (U.S.S.G.) calculations:

a.  Base Offense Level, U.S.S.G. § 2D1.2:                                                          12
    (At least 5 kg, but less than 10 kg, of converted drug weight, U.S.S.G. § 2D1.1(c)(14))
b.  Acceptance of Responsibility:                                                                    - 2
c.  Adjusted Offense Level:      10

Based on the government's review, Montoya Marquez is a Criminal History Category I, resulting in an advisory Guidelines range of 6-12 months.

## III.    GOVERNMENT'S SENTENCING RECOMMENDATION

The Court should impose a sentence sufficient, but not greater than necessary, to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008). The Court should begin by calculating the correct sentencing range under the Sentencing Guidelines. *Id.* The Guidelines are "the 'starting point and the initial

benchmark,'" *United States v. Ellis*, 641 F.3d 411, 415 (9th Cir. 2011) (quoting *United States v. Kimbrough*, 552 U.S. 85, 108 (2007)), and the Court should "remain cognizant of them throughout the sentencing process." *United States v. Gall*, 552 U.S. 38, 50 n.6 (2007). After determining the appropriate Guidelines calculations, the Court should then evaluate the sentence for substantive reasonableness in light of the factors set out in Section 3553(a). *Carty*, 520 F.3d at 991-93. Here, the most important considerations are the nature and circumstances of the offense, the need to promote respect for the law, the need to afford adequate deterrence, and the protection of the public. 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(C).

As the Court knows through prior proceedings in this case, the Reanos-Moreno DTO employed numerous street-level drug dealers who were housed in residences in the East Bay, received drug deliveries at those redistributor houses, and then traveled to the Tenderloin to sell drugs to users. As outlined in the Criminal Complaint, Montoya Marquez lived at a redistributor house on Foothill Boulevard in Oakland. (Compl.¶¶ 129-131.) Montoya Marquez placed orders over the phone for sale quantities of drugs, which Reanos-Moreno or a courier then delivered. For example, during a phone call on January 31, 2019, at approximately 10:25 a.m., Montoya-Marquez asked if Reanos-Moreno had "crystal"- i.e. crystal methamphetamine. (Paidipaty Decl., Exhibit 1, Line Sheets at Call 826.) Reanos-Moreno indicated that he did and that it was "good." (*Id.*) Approximately one hour later, at 11:25 a.m., Reanos-Moreno called Montoya Marquez and asked Montoya Marquez to open the door. (*Id.* at Call 828). At 11:33 a.m., location data associated with Reanos-Moreno's phone indicated that the phone was near the Foothill Boulevard redistributor house, indicating that Reanos-Moreno was dropping off the methamphetamine.

Once Montoya Marquez received the deliveries, the drugs were repackaged into individual use quantities for sale on the street. On May 8, 2019, an undercover officer with the San Francisco Police Department approached Montoya Marquez near Hyde and Eddy Streets – a short two blocks from this Court. (Compl. ¶ 184.) The officer asked if Montoya Marquez had "black," meaning heroin. (*Id.*) Montoya Marquez walked to the corner and returned with a small pouch containing bindles. (*Id.*) He asked the officer, "How much?" (*Id.*) The officer responded, "40," meaning $40 worth of heroin. (*Id.*) Montoya Marquez said, "Half," gave a bindle to the officer and repeated, "Half gram." (*Id.*)

After the officer paid, Montoya Marquez provided his phone number and noted that he was there every day from 3 p.m. to 9 p.m.  (*Id.* ¶ 185.)  Montoya Marquez's actions exemplify what is happening on the streets of the Tenderloin every day – drug dealing is literally business as usual.

The government recognizes that Montoya Marquez is a street-level dealer rather than a supplier or leader/organizer.  The drugs seized from him were minimal in comparison to other defendants.  A key distinction, however, is that Montoya Marquez, unlike almost all of his co-defendants has legal status in this country, including the ability to work a legal job.  Instead of working lawfully or perhaps in addition to, Montoya Marquez sold drugs, squandering the opportunity afforded him.  The Court should consider this in determining a sentence that promotes respect for the rule of law.  *See* 18 U.S.C. § 3553(a)(2)(A).

Further, because Montoya Marquez is a lawful permanent resident and out of custody, he suffers no prejudice from going through the full and proper presentence investigation process.  Probation can assess this case, as it typically does with scores of defendants in this District, and determine appropriate conditions of supervised release.  Further, the parties and the Court can better understand the factors to consider towards a sentence.  Based on undersigned counsel's notes from the time of the detention hearing, Montoya Marquez was participating in a diversionary program through the San Francisco Superior Court based on prior drug trafficking activity.  Because of the timing of the current change of plea and request for sentencing coupled with the current conditions with the outbreak of COVID-19, government counsel was unable to re-review the bail report prepared by U.S. Pretrial Services to confirm these facts and the surrounding circumstances.  If Montoya Marquez was attending a diversion program locally while continuing to sell drugs, the Court should accurately know that information and consider it when determining an appropriate sentence.  *See* 18 U.S.C. § 3553(a)(2)(B).

Should the Court grant defendant's request for summary sentencing, the government recommends the imposition of a low-end Guidelines sentence of six months.  Defendants similarly situated in cases related by the Court served approximately six month terms in custody.  *See United States v. Viera-Chirinos, et al*, No Cr 19-0367 CRB.  Montoya Marquez has only served ten days.  Further, while an sentence of incarceration is warranted given Montoya Marquez's continual drug dealing and participation in an organized drug ring, because his advisory Guidelines range falls within

1 Zone B of the Sentencing Table, this Court can opt to impose the six months either in custody or on
2 strict conditions of home confinement, allowing Montoya Marquez to leave his home only for purposes
3 of employment, medical appointments, or meetings with Probation.  A straight time served sentence
4 would be disproportionate to sentences received by similarly situated defendants and would not
5 adequately account for the conduct here.

6 **IV.    CONCLUSION**

7 　　　　The government respectfully requests this Court to refer this case to Probation for the preparation
8 of a Presentence Investigation Report.  Alternatively, the government recommends the imposition of a
9 six-month sentence, followed by one year of supervised release, and a mandatory $100 special
10 assessment.

11 DATED: March 17, 2020　　　　　　　　　　Respectfully submitted,

13 　　　　　　　　　　　　　　　　　　　　　　DAVID L. ANDERSON
　　　　　　　　　　　　　　　　　　　　　　　United States Attorney

14 　　　　　　　　　　　　　　　　　　　　　　    /s
15 　　　　　　　　　　　　　　　　　　　　　　SAILAJA M. PAIDIPATY
　　　　　　　　　　　　　　　　　　　　　　　Assistant United States Attorney